**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

THE KATIROLL COMPANY, INC.,    )
                         )
           Plaintiff,         )
                         )       Civil Action No. 10-3620 (GEB)
     v.                  )
                         )       **MEMORANDUM OPINION**
KATI  ROLL AND PLATTERS INC.,    )
                         )
          Defendant.      )
_____)

**BROWN, Chief Judge**

      This matter comes before the Court upon the motion for a preliminary injunction (Doc. No. 39) of the plaintiff The Katiroll Company, Inc., ("Plaintiff").  The defendant Kati Roll and Platters, Inc. ("Defendant") opposes the motion.  The Court has considered the parties' submissions and considered the evidence and argument at an evidentiary hearing held on October 21 and 22, 2010.  For the reasons that follow, the Court will grant the preliminary injunction in accord with these findings of fact and conclusions of law.

## I.      BACKGROUND

      This litigation involves fast food, specifically the katiroll, a type of street food that originates from India.  Both Plaintiff restaurant, The Katiroll Company, Inc., and Defendant restaurant, Kati Roll and Platters, Inc., sell this type of food.  This litigation began on March 3, 2010, when Plaintiff filed a complaint in the Southern District of New York, alleging causes of

action for trademark infringement, trade dress infringement, and unfair competition.  (Compl.; Doc. No. 1.)   Thereafter, the Southern District of New York ordered that this matter be transferred to the District of New Jersey based on the lack of personal jurisdiction in New York. (Memorandum Order dated July 9, 2010; Doc. No. 31.)

Plaintiff filed the instant motion for a preliminary injunction on August 27, 2010.  (Doc. No. 39.)  After receiving both the opposition and reply briefs and all the supporting documents, the Court held an evidentiary hearing on October 21 and 22, 2010.  For the reasons stated below, the Court will grant Plaintiff's motion for a preliminary injunction.  This opinion constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## II.    DISCUSSION

### A.    Standard of Law

The grant of injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances."  Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988) (citing United States v. City of Philadelphia, 644 F.2d 187, 191 n.1 (3d Cir. 1980)).  When deciding such a motion, a court must consider four factors: (1) the moving party's likelihood of success on the merits; (2) the probability of irreparable injury to the moving party in the absence of relief; (3) the potential harm to the non-moving party; and, if applicable, (4) the public interest.  Fechter v. HMW Indus., Inc., 879 F.2d 1111, 1116 (3d Cir. 1989) (citing United States v. Price, 688 F.2d 204, 211 (3d Cir. 1982)).  "Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should

2

the injunction issue." Opticians Ass'n of America v. Independent Opticians of America, 920

F.2d 187, 192 (3d Cir. 1990) (citing ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir.

1987)).

B.      **Findings of Fact**[1]

The Court finds the following facts to be true and credible.  Plaintiff "owns United States

Service Mark Registration No. 3,352,040 [(the "Mark")] for THE KATI ROLL COMPANY, for

restaurant and carry-out restaurant services in Class 43 and rights in unregistered trade dress."

(Pl.'s Br. at 2; Doc. No. 39-1 (citing Saha Decl. ¶¶ 4-8).)  Payal Saha is the president of Plaintiff

company.  Plaintiff opened its first location in June 2002 and currently operates two restaurants

in Manhattan and one in London.  (Id. at ¶ 2.)

Plaintiff's first location was opened at 99 MacDougal Street in Manhattan, the second

location opened was opened at 140 West 46th Street in Manhattan in 2005 but in 2007 was

moved to 49 West 39th Street, and the third location was opened in 2008 in London.  (Saha Decl.

¶ 2.)  Plaintiff serves "Indian fast food wraps consisting of one or more fillings such as seasoned

kebab meats, eggs, cheese, vegetables and potato wrapped inside an Indian flatbread," which are

"prepared on a griddle," and cost between $3.25 and $6.25.  (Id. at ¶ 3.)

Plaintiff's stores are decorated in "an orange color scheme including orange interior and

exterior surfaces, orange signage, a menu with an orange background and orange decorative

elements."  (Id. at ¶ 5.)  Each store also has "an unpainted red brick wall" and "light brown 12"

---

[1]      To the extent that any findings of fact might constitute conclusions of law, they
are adopted as such.  Conversely, to the extent that any conclusions of law constitute findings of
fact, they are adopted as such.

square ceramic tile[s] on the floor."  (Id.)  In addition, the layout of each of Plaintiff's locations "features an open glass front with windows unobstructed by café curtains or other coverings, limited seating in front with the counter further back and an open kitchen plan" and although limited seating is available, the restaurants are generally small and "geared to take-away business."  (Id. at ¶ 7.)

Plaintiff's restaurants have received substantial press acclaim, and exposure in print, online, and among consumers.  When Plaintiff opened its first location, "[s]everal well-known New York publications lavished immediate critical acclaim on The Kati Roll Company."  (Id. at ¶ 9.)  Time Out New York, for example, featured Plaintiff in 2002, and to date has given Plaintiff three awards.  (Id.; Ex. 2.)  In addition, New York Magazine and the Village Voice featured Plaintiff in articles in July 2002.  (Id. at ¶ 10; Ex. 3.)  The Daily News also wrote about or mentioned Plaintiff in articles in 2008.  (Id.)  Travel and Leisure included Plaintiff in a poll for "World's Best" for New York (id. at ¶ 11; Ex. 4), and India Today International featured a cover story in 2005 about the location (id. at ¶ 12; Ex. 5).  Plaintiff "expended significant resources to foster and maintain press interest in its popular stores."  (Id. at 3.)  Plaintiff also "maintains a website with information about its products and stores at http://www.thekatirollcompany.com." (Pl.'s Br. at 3.)  In addition to this press and publicity, reviews and fan pages are available on websites such as Facebook and Yelp.  (Id. at 14.)  Saha, President of Plaintiff, asserts that "The Kati Roll Company [is] a widely recognized brand in the U.S. and abroad."  (Id.)

Saha credibly stated, "[i]n 2007 Niraj Jivani and his uncle requested a meeting with me. We met in person at [Plaintiff's] Manhattan office. [They] proposed opening a branch or franchise of The Kati Roll Company in New Jersey.  After considering the offer, [Plaintiff]

declined." (Id. at ¶ 17; Oct. 21, 2010 Tr. 11:20-12:17.)  Niraj Jivani, principal shareholder of

Defendant, acknowledges such a meeting that lasted "approximately ten minutes with Plaintiff's

principal to discuss the possibility of Plaintiff franchising its restaurant" to Jivani.  (Jivani Decl.

at ¶ 10; Oct. 21, 2010 Tr. 22:4-22:22.)  Jivani stated he learned about Plaintiff company from

"word of mouth" and knew that they served katirolls.  (Oct. 21, 2010 Tr. 19:7-19:11; 19:19-

20:13.)  The meeting occurred at Plaintiff's West 46th Street location in the office above the

restaurant.  (Oct. 21, 2010 Tr. 14:3-14:14.)   After the meeting, Jivani looked into the restaurant

on his way out, and he noticed the orange coloring. (Oct. 21, 2010 Tr. 18:1-18:13.)  Therefore,

the Court finds that Jivani had knowledge that Plaintiff company had orange awnings and had

orange and white as its theme colors.  (Oct. 21, 2010 Tr. 35:13-35:18.)  Jivani agrees that

"Plaintiff rejected the proposal" and that he therefore "continued with [his] plans to open a

restaurant." (Id. at ¶ 12.)

　　　The space that Jivani leased is located on Easton Avenue, New Brunswick, New Jersey.

(Jivani Decl. at ¶¶ 1-6, 9; Doc. No. 46-1.)  Jivani asserts that "[t]he space that was available is

situated among a row of restaurants on Easton Avenue" and that "[t]he space is small and has an

open face window facing the street, together with an exposed brick wall on one side of the

space." (Id. at ¶ 7.)  The inside layout existed prior to Defendant opening in the space, as did an

exposed brick wall or support column inside the space.  (Oct. 21, 2010 Tr. 34:21-35:1; 110:21-

111:21.)

　　　Despite several of the restaurant's features being dictated by the location he leased, Jivani

chose some of the decorative elements, for example the wall paint and type and color of flooring

tile. (Oct. 21, 2010 Tr. 30:19-31:1.)   Jivani directed that the internal walls of the space be

painted "burnt orange". (Jivani Decl. at ¶ 8.)   In Defendant's front window one can see a white counter-top up against the front window with seating and "neon signs as well as help wanted signs and other signs."  (Id. at ¶¶ 15, 16.)  Defendant's main sign that identifies the restaurant "consists of a series of raised, arranged letters with the words "Kati Roll" forming an arc with the words "Platters" beneath it and an ampersand located in the middle" in white lettering on an all orange background.  (Id. at ¶ 17.)  The interior of Defendant company does not have any Bollywood pictures on the walls, and it does not have any tables and chairs. (Id. at ¶¶ 19, 20.)

The Court found Saha to be truthful and credible during the evidentiary hearing on October 22, 2010.  Saha asserted various incidents that illustrate actual confusion.  First, she stated, "[o]n December 31, 2009, I attended a New Year's Eve party in Kolkata, India.  A 55-60 year-old woman pulled me aside.  She complained to me about the restaurant in New Brunswick, New Jersey.  She believed the restaurant was The Kati Roll Company.  I had to explain to her that The Kati Roll Company does not have a store in New Brunswick." (Saha Decl. at ¶ 19.) She also stated that "[a] family member in India has had a similar experience.  People have complained to her about the food in the New Brunswick restaurant, thinking it is owned by [Plaintiff]."  (Id. at ¶ 20.)  Moreover,  "[i]n November 2009 [Plaintiff] received an e-mail from a potential franchisee who asked, 'Also, is the one in Rutgers New Brunswick your franchise or just a knock off?'" (Id., Ex. 6.)  In addition, Ramkumar Ramakrishan, who has been the management analyst for Plaintiff for the past three years, asserted that he "oversee[s] fulfillment of large orders" and when "[c]ustomers and potential customers have called [him] about catering orders in New Jersey" they "ask if the store in New Brunswick is ours and whether they can place the order there."  (Ramakrishan Decl. at ¶¶ 1-3; Doc. No. 39-3.)  Ramakrishan identified an

individual specifically, Mr. Hersh, who exhibited this exact confusion on June 12, 2010.  (Id. at ¶ 4.)  He also has heard customers in the 39th Street store "ask employees whether the store in New Jersey is ours."  (Id. at ¶ 6.)  Moreover, Ranjeet Kadam, who is an employee at the 39th Street Manhattan store and who has worked there during various periods for the past two years, stated that he has heard customers exhibit confusion about whether or not Plaintiff has a store in New Jersey, specifically in New Brunswick.  (Kadam Decl. at ¶¶ 1-4.)  Kadam has experienced customers' confusion with respect to items on their menu, and by way of example states that customers have ordered items that they do not sell, but rather, are offered at Defendant's restaurant.  (Id. at ¶¶ 5-7.)  Aprana Dut, who is Saha's mother, stated that an individual named Sumita Ghosh, approached her to ask if Plaintiff opened a restaurant in New Brunswick, New Jersey, and that she had heard complaints about the location.  (Dut Decl. at ¶ 2, 3.)

Saha asserted that Plaintiff "has been planning to franchise," that they "put information about franchising on [the] website and provide[d] a link for people to e-mail . . . about franchising opportunities."  (Saha Decl. at ¶ 21.)  Saha maintained that Plaintiff "receive[s] 2-3 e-mails a day from people interested in obtaining The Kati Roll Company franchises.  Many of those inquires have come from New Jersey.  We recently moved closer to making a franchise deal," but "[t]he questions and mistakes caused by [Defendant] store in New Brunswick are problematic for our franchising efforts."  (Id. at ¶¶ 22, 23.)  She restated on cross-examination that she has concrete plans to franchise the store.  (Oct. 22, 2010 Tr. 76:12-23.)  She explained in great detail the process that she has undertaken to franchise her business, and stated that she hopes to open a location in New Jersey within the next few months.  (Oct. 22, 2010 Tr. 77:4-82:1.)

7

Saha stated that after this litigation commenced, she learned that "Niraj Jivani posted on the Internet that he planned to open an "'original' or 'official' Kati Roll Company" in New Jersey." (Saha Decl. at ¶ 18.)  While Jivani denies this accusation, the Court does not find Jivani's denial credible and finds that Jivani made these statements himself or that he gave unnamed others the power and authority to post these statements, and that ultimately Jivani had control over the content of the statements.  Indeed, Jivani stated that he "did not make the posts that were attributed to [him]" but that "[i]t is likely that my friends or acquaintances made such postings to generate 'chatter' on the internet and to promote my new restaurant." (Jivani Decl. at ¶ 13.)  This issue was explored on cross-examination, and the Court finds that Jivani either made the posts himself or provided the means to another by which such posts were made.  These statements were made on various websites, including Platters.com, The Lounge Board, and various Facebook pages.

## C.   Conclusions of Law

### 1.   Likelihood of Success on the Merits

#### a.   Claim for Trademark Infringement

Plaintiff has asserted a cause of action for trademark infringement pursuant to Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), (Compl. ¶ 27; Doc. No. 1), which provides:

Any person who shall, without the consent of the registrant–

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.  Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1).  "Generally, to win a trademark claim, a plaintiff must establish that (1) the marks are valid and legally protectible; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion." Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990).

"If the mark at issue is federally registered and has become incontestible, then validity, legal protectability, and ownership are proved."  Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000).  See also Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964) (stating that pursuant to the Lanham Trademark Act Section 1057(b), "the registration of a trademark by the Patent Office is prima facie evidence of its validity [and] . . . the statutory presumption of validity simply casts the burden of proof in the one who questions the validity of the registered trademark"); Sylvania Electric Prods., Inc. v. Dura Electric Lamp Co., 247 F.2d 730, 732 (3d Cir. 1957) ("registration of a trade-mark by the [PTO] furnishes an evidentiary presumption of validity").  "A trademark becomes incontestible after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has

been no adverse decision concerning the registrant's ownership or right to registration." <u>Fisons Horiticulture, Inc. v. Vigoro Indus., Inc.</u>, 30 F. 3d 466, 472 n.7 (3d Cir. 1994). <u>See also</u> 15 U.S.C. § 1065.

"Besides validity and ownership, a plaintiff must also prove likelihood of confusion, which is said to exist 'when the consumers viewing the mark would probably assume that the product . . . it represents is associated with the source of a different product . . . identified by a similar mark.'" <u>Id.</u>  In <u>Scott Paper Co. v. Scott's Liquid Gold, Inc.</u>, 589 F.2d 1225 (3d Cir. 1978), the Third Circuit established a number of factors that should be considered when evaluating the "likelihood of confusion" of a similar mark:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

<u>Id.</u> at 1229.  These factors have become known as the <u>Lapp</u> factors.  <u>See</u> <u>Interpace Corp. v. Lapp, Inc.</u>, 721 F.2d 460 (3d Cir. 1983).  The Third Circuit noted that "the degree of similarity between the two marks" is the most important factor to consider.  <u>Ford</u>, 930 F.2d at 293.  "If the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" <u>Opticians Ass'n of Am.</u>, 920 F.2d at195 (quoting 2 McCarthy, Trademarks and Unfair Competition at § 23:7).  As the Third Circuit has established, "proof of actual confusion is not necessary; likelihood is all that need be shown." <u>Id.</u>

The Court denies Plaintiff's motion on this ground.  The Court first notes that Plaintiff does not provide significant legal argument in its moving brief in support of its position on this issue.  Further, the Court concludes that Plaintiff has failed to satisfy the requirements of 15 U.S.C. § 1065, which requires that "an affidavit is filed . . . within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce," and that: (1) "there has been no final decision adverse to the owner's claim of ownership of such mark for such goods or services, or to the owner's right to register the same or to keep the same on the register"; and (2) there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not finally disposed of."  15 U.S.C. 1065.

In addition, on issue concerning the infringement of the '040 Mark's infringement, the Court is not satisfied that there is a substantial likelihood of success on the merits concerning likelihood of confusion.  The Court has considered the Lapp factors and notes that the parties agree that Plaintiff's mark, "THE KATI ROLL COMPANY", is a different name than Defendant's name, which is Kati Roll and Platters, Inc., but Plaintiff has not provided evidence regarding the Lapp factors on this issue, such as whether the word "katiroll" is generic, suggestive, or descriptive. Other evidence was presented was that on a few occasions, Jivani posted on the internet that the "official Katiroll Company" was going to opening a location in New Brunswick.  The Court concludes that these statements on message boards on the internet do not alone create a substantial likelihood of success on the merits of a likelihood of confusion. For these reasons, the Court denies injunctive relief regarding Plaintiff's cause of action for

11

trademark infringment.

        b.       <u>Claim for Trade Dress Infringement</u>

Pursuant to 15 U.S.C. § 1125(a), a cause of action for trade dress infringement may be sustained under the Lanham Act. <u>TrafFix Devices, Inc., v. Mktg. Displays, Inc.</u>, 532 U.S. 23, 28-29 (2001). "Trade dress" refers to "the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique." <u>McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC</u>, 511 F.3d 350, 357 (3d Cir. 2007) (citing <u>Rose Art Indus., Inc. v. Swanson</u>, 235 F.3d 165, 171 (3d Cir. 2000) (internal quotations omitted)). The Supreme Court in <u>Two Pesos</u> commented that "[t]rade dress is the total image of the business" and "may include the shape and general appearance of the exterior of the restaurant, the identifying sign, the interior kitchen floor plan, the decor, the menu, the equipment used to serve food, the servers' uniforms and other features reflecting the total image of the restaurant." <u>Two Pesos v. Taco Cabana</u>, 505 U.S. 763, 764 n.1 (1992). "The purpose of trade dress protection is to 'secure the owner of the trade dress the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.'" <u>Id.</u> (citing <u>Shire US Inc. v. Barr Labs. Inc.</u>, 329 F.3d 348, 353 (3d Cir. 2003) (internal quotes omitted)). A plaintiff must prove that: "(1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." <u>McNeil Nutritionals</u>, 511 F.3d at 357 (citing <u>Shire</u>, 329 F.3d at 353).

Turning first to whether the design is "non-functional", it should be noted that "trade

dress protection extends only to incidental, arbitrary or ornamental product features which identify the product's source."  Shire, 329 F.3d at 353 (citing Eppendorf-Netheler-Hinz GmbH v. Ritter GmbH, 289 F.3d 351, 355 (5th Cir. 2002)).  "The functionality doctrine 'accommodates the twin purposes behind the Lanham Act.  It protects the manufacturer . . . from the copying of those features that signify a product's source and encourages competition by preventing one manufacturer from acquiring a monopoly by attempting to trademark those features of a design essential to a successful product of that type."  Id. (citing Standard Terry Mills, Inc. v. Shen Mfg. Co., 803 F.2d 778, 780-81 (3d Cir. 1986)).  "[A] product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."  Id. (citing Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995) (internal quotations omitted).)  Another test for functionality is whether the "functional feature is one of the exclusive use[s] of [which] would put competitors at a significant non-reputation-related disadvantage."  Id. (citation and internal quotes omitted).

The second issue that a court must address is whether  the design is inherently distinctive or has acquired secondary meaning.  See McNeil Nutritionals, 511 F.3d at 357 (citation omitted). "A mark or dress can be inherently distinctive if its 'intrinsic nature serves to identify a particular source.'  A non-inherently distinctive mark or dress can have acquired distinctiveness through attachment of secondary meaning, which occurs when 'in the minds of the public, the primary significance of a [mark or dress] is to identify the source of the product rather than the product itself."  Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc., 280 F.3d 619, 635 (6th Cir. 2002) (citing Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982)).

"In determining whether a product's trade dress has acquired secondary meaning, a court

considers four factors: (1) long use; (2) advertising; (3) sales volume; and (4) identity of service or origin in the minds of the purchasing public." Tools USA & Equip. Co. v. Champ Frame Straightening Equip., 87 F.3d 654, 660 (4th Cir. 1996) (citing Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1528 n.3 (4th Cir. 1984) (internal quotations omitted).)  Color alone cannot be inherently distinctive, but "over time, customers may come to treat a particular color on a product or its packaging . . . as signifying a brand." Wal-mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 212 (2000) (citation and internal quotes omitted).

Finally, a court should consider the likelihood of confusion.  "The likelihood of confusion between two trade dresses is a question of fact." Id. (citations omitted).  "A likelihood of confusion exists when consumers viewing the defendant's trade dress would assume that the product it represents is associated with the source of a different product identified by the plaintiff's similar trade dress." McNeil Nutritionals, 511 F.3d at 357 (citing A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 211 (3d Cir. 2000)).  The Lapp factors, a qualitative inquiry, are outlined previously in this opinion, and they are considered by the court in its determination of whether there is likelihood of confusion.  See Interpace Corp. v. Lapp, Inc., 721 F.2d at 462-63.  The factors are:

(1)    the degree of similarity between the owner's mark and the alleged infringing mark;

(2)    the strength of the owner's mark;

(3)    the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4)    the length of time the defendant has used the mark without evidence of actual confusion arising;

(5)     the intent of the defendant in adopting the mark;

(6)     the evidence of actual confusion;

(7)     whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8)     the extent to which the targets of the parties' sales efforts are the same;

(9)     the relationship of the goods in the minds of the consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10)    other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

Kos, 369 F.3d at 709 (quoting A&H Sportswear, Inc., 237 F.3d at 215).

The Court grants Plaintiff's motion on this issue.  The evidence reflects that Plaintiff has shown the moving party's substantial likelihood of success on the merits and the probability of irreparable injury to Plaintiff in the absence of relief; and that there is little to no potential harm to the Defendant or to the public interest.


**FURTHER FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Turning first to the likelihood of success on the merits, the Court considers the factors that one must show to sustain a claim for trade dress infringement.  As previously noted, a plaintiff must prove that: "(1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." McNeil Nutritionals, 511 F.3d at 357.   Here, evidence of Plaintiff's image, including "the shape and general

15

appearance of the exterior of the restaurant, the identifying sign, the interior kitchen floor plan, the decor, the menu, the equipment used to serve food, the servers' uniforms and other features reflecting the total image of the restaurant," Two Pesos v. Taco Cabana, 505 U.S. at 764 n.1, is properly considered as it compares to Defendant's image.  Noting that "incidental, arbitrary or ornamental product features which identify the product's source," Shire, 329 F.3d at 353, are non-functional, the non-functional aspects of each party's image that are the same are the orange and white color schemes, the exposed and unpainted red brick walls, the brown tile on the floor, and a large window-front that can been seen through from the street.  In addition, the signs of each are similar albeit with a different font and layout but with each designed with white lettering and an orange background.  While the kitchen in Defendant restaurant is not "open" in the traditional sense, the evidence showed that a patron from the counter/cash register area could indeed see into the kitchen and see the people cooking and the patron could see hood of the range.  (Oct. 21, 2010 Tr. 112:11-113:17.)  The evidence also shows that Plaintiff's restaurants' kitchens are "open".  These elements are "non-functional," and as a result, the Court concludes that this element has been shown.  The Court also notes with respect to the "image" of each of the restaurants that the hours of operation for each of Plaintiff's restaurants and Defendant's restaurant are extended to the early hours of the morning.  Finally, the restaurants both sell katirolls, an Indian fast food, and they both operate in the "fast-food" style, meaning, that while there is limited seating in both Plaintiff and Defendant restaurants, the food is provided quickly to the patron and wrapped and packaged "to go".

Regarding whether the design has acquired secondary meaning, the Court concludes that Plaintiff has established a substantial likelihood on the merits that it has, and to this end, the

Court has considered the four factors of (1) long use; (2) advertising; (3) sales volume; and (4) identity of service or origin in the minds of the purchasing public.  See Abercrombie & Fitch Stores, Inc., 280 F.3d at 635.  Turning first to the "long use" of Plaintiff's trade dress, Saha states that after opening her second location on West 46th Street, she "incorporated decorative elements from the MacDougal Street store into the design" and that "[i]n designing the [all] the stores, we incorporated common elements so all our stores have a similar look and the customer has a familiar experience."  (Saha Decl. ¶¶ 1, 2; Doc. No. 39-2.)  Therefore, the Court concludes that Saha has demonstrated the long-use of the trade dress of her locations, in that the trade dress has been used since 2002, the time that the first location opened.  Saha stated that "in all the nine years that [she] has been in business, [she's paid for] advertis[ing] once." (Oct. 22, 2010 Tr. 68:9-68:11.)  However, the Court notes that whether or not "advertising" is relevant is when it includes or makes reference to the trade dress of Plaintiff's locations.  With respect to sales volume, Plaintiff's employee Ranjeet Kadam stated that on a typical weekday they would service approximately 500 to 700 customers and on a typical weekend approximately 1000 people.  (Oct. 21, 2010 Tr. 42:9-42:11.)  Another of Plaintiff's employees, Ramkumar Ramakrishan, estimated that approximately fifteen to twenty percent of customers that visited his Manhattan location were from New Jersey.  (Oct. 22, 2010 Tr. 50:22-51:4.)  Both Plaintiff's employees Kadam and Ramakrishan recounted stories of unidentified customers who asked whether Plaintiff company also owned the location in New Brunswick, New Jersey, and some customers also have voiced complaints about the Defendant's store. (Kadam Decl. ¶¶ 3-8; Ramakrishan Decl. ¶¶ 4, 6-8.) The statements of Kadam and Ramakrishan indicate that the customers who have initiated conversations about Defendant's New Jersey store are confused because they identify the origin

17

of the product or restaurant to be that of Plaintiff.  For these reasons, the Court concludes that there is a substantial likelihood of success on the merits of this element.

Turning to the third requirement, the Court concludes that consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product."  To this end, the Court has considered each of the <u>Lapp</u> factors.  <u>See</u> <u>Interpace Corp. v. Lapp, Inc.</u>, 721 F.2d at 462-63.   The Court has previously referred to the credible testimony of various persons, including Ms. Saha, her mother and employees, who  have heard people and customers state their confusion and the Court has reviewed and considered the many exhibits submitted to the Court from various websites where people have asserted their confusion.  The Court notes that in consideration of the degree of similarity between Plaintiff's trade dress and the alleged infringing trade dress that they are quite similar with both having the same interior color scheme, similar brown 12" square floor tile, a similar exposed red brick wall in the interior of each of the restaurants, a large window in the front of the store, and an orange sign with white lettering.  In addition, both sell Indian fast-food with a concentration of katiroll offerings, stay open until the early hours of the morning, and offer limited seating, with the concentration of their business "to go".  The evidence produced indicates that the relevant public's association of Plaintiff's trade dress to Plaintiff restaurant is relatively strong. The pricing of the food Plaintiff offers is in accord with fast food offerings, starting at approximately $3.25 per katiroll, indicating that customers do not exercise a great deal of care and attention to the purchase.  Turning to the fourth <u>Lapp</u> factor, the Court notes that while Plaintiff registered its mark in June 2002, Defendant did not open his doors until in or around 2007, and therefore, any confusion that may have arisen could only have occurred between 2007 and the present.  However, even before

Jivani opened his location in New Brunswick, Jivani or his agent made or caused to be made statements on the internet that have caused confusion.  (Oct. 21, 2010 Tr. 38:3-11.)

To the extent that Jivani denies making the posts, the Court had the opportunity to examine the demeanor and listen to his testimony and does not find Jivani credible.  The Court finds and concludes that Jivani made the posts himself on all the examined websites or caused these posts to be made by providing information to another individual, his agent, to make these posts on his behalf.  To this end, the Court concludes there is a substantial likelihood of success on the merits that actual confusion occurred as soon as these posts were made and surely Plaintiff produced evidence of this actual confusion.

The Court also concludes that Plaintiff is likely to succeed in showing that Jivani, as principal of Defendant business, intended to adopt the trade dress of Plaintiff's restaurant.  The Court has considered in this regard that Jivani and his uncle visited a Manhattan location of Plaintiff restaurant to meet with Saha to inquire about a franchise and had the opportunity to look into the restaurant at that time.  When Saha denied Jivani's request to franchise, he thereafter opened his own restaurant as has been previously described. With respect to the next Lapp factor, very little, if any, evidence was produced on the point of channels of trade and the advertising medium of the parties, and therefore, the Court will not consider this factor in its opinion.  The Court, likewise, has previously addressed, albeit briefly, the target markets of the parties.  The Plaintiff has shown that it is located in two separate locations in Manhattan, in addition to London, and that customers go into Plaintiff's locations who have also been to Defendant restaurant in New Brunswick, New Jersey.  Therefore, while the extent of the overlap is unknown at this time, the Court concludes that there likely is a percentage of people that are currently

target customers of both parties.  In addition, the franchising efforts, as Saha described during the evidentiary hearing, in New Jersey are certainly affected and the target markets of these impending new locations are likely to be shown to overlap with the target customers of Defendant.  This is likely to be further complicated due to the similarity of the type of food offered.  Having considered the Lapp factors, the Court concludes that there is a substantial likelihood of success on the merits with respect to the likelihood of confusion.  In sum, the Court concludes that there is a substantial likelihood of success on the merits with respect to Plaintiff's cause of action for trade dress infringement.

c.      Claim for Unfair Competition

Federal trademark infringement, 15 U.S.C. §1114, and federal unfair competition, 15 U.S.C. §1125(a)(1)(A), are assessed under identical standards.  A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).  "To prove either form of Lanham Act violation, a plaintiff must demonstrate that (1) it has a valid and legally protect able mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion."  A&H Sportswear, Inc., 237 F.3d at 210 (citing Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 437 (3d Cir. 2000); see also Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708-09 (3d Cir. 2004) (stating that "[t]o prevail on a claim of trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protect able mark . . . must show that a defendant's use of a similar mark for its goods 'causes a likelihood of confusion.'") The plaintiff bears the burden of proof, and must meet the burden by a preponderance of the evidence.  A&H Sportswear, Inc., 237 F.3d at 210-11

(citing <u>Am. Home Prods. Corp. v. Barr Labs., Inc.</u>, 834 F.2d 368, 371 (3d Cir. 1987)).

The Third Circuit "has adopted a non-exhaustive list of factors to consider in evaluating likelihood of confusion, commonly referred to as the '<u>Lapp</u> factors.'" <u>Kos</u>, 369 F.3d at 709 (citing <u>Interpace Corp. v. Lapp, Inc.</u>, 721 F.2d 460, 463 (3d Cir. 1983)), and the Court has previously outlined these factors earlier in its opinion.

The Court incorporates its previous findings of fact and conclusions of law on the likelihood of success on the merits with respect to likelihood of confusion.  In addition, the Court has also concluded that Plaintiff "owns United States Service Mark Registration No. 3,352,040 [(the "Mark")] for THE KATI ROLL COMPANY, for restaurant and carry-out restaurant services in Class 43 and rights in unregistered trade dress" and this right is legally enforceable. (Pl.'s Br. at 2; Doc. No. 39-1 (citing Saha Decl. ¶¶ 4-8).)

At this point, the Court also notes the extensive evidence introduced during the evidentiary hearing regarding statements made by Jivani and his agents about Plaintiff.  The Court does not find Jivani credible regarding his denial of control or knowledge of such statements.  The Court notes to this end that Defendant does not argue that these statements were not made.  He only argues that he is either not responsible, did not know about them, did not have the ability to have these posts removed, did not have the time to have these posts removed as he was out of town, and did not direct that others post these statements.  The Court does not find that Jivani's excuses are credible or persuasive.

The Court concludes that there is a substantial likelihood of success on the merits that Defendant, through its principal Jivani, engaged in the following conduct that constitutes unfair competition as it is defined by the Lanham Act in its consideration of the <u>Lapp</u> factors.  In 2007,

21

Jivani posted or caused to be posted on the Lounge Board, a website, "Katiroll Company coming to New Brunswick, New Jersey, Easton Avenue, directly across Cluck-U" (Oct. 21, 2010 Tr. 38:3-4) and also wrote "Coming soon . . . I'm Niraj from Manalapan, New Jersey. I'm new to this forum, and I hope everyone can just appreciate Katiroll Company coming to Rutgers N.B.," (Oct. 21, 2010 Tr. 38:7-10), to which someone commented "Are you a franchisee?" (Oct. 21. Tr. 38:19.) Although he admitted that he does live in Manalapan, he denied making this statement. This Court, having heard and considered the testimony and all other evidence in the case, does not find his denial credible. To the contrary, the Court finds that Jivani either posted or caused these statements to be posted. While he denied making this statement, he admitted that he does live in Manalapan. The Court does not find his denial credible after having heard all the evidence and reviewed all the evidence. Another participant on the website asked "how many Kati Rolls are there now? I know there were two, the one on MacDougal . . . ." (Oct. 21, 2010 Tr. 39:11-14.)

The Court also finds that Jivani uses the "handle" or what is also referred to as the screen name "AnDn2Dy4," which phonetically is pronounced "An Indian to Die For." (Oct. 21, 2010 Tr. 40:19-23.) In addition, the Court finds that Jivani has other people writing on his behalf using his screen name. (Oct. 21, 2010 Tr. 41:2-4.) In other words, the Court finds that Jivani gives these other individuals his screen name, password, and any other relevant identifying information so that these individuals can pretend to be Jivani. (Oct. 21, 2010 Tr. 41:20-23.) Moreover, the Court notes that the contact e-mail for the Facebook page, "Kati Rolls and Platters Indian Grill", was NirajJivani@katirollandplatters.com, it had an American Online instant messaging account with the screen name "AnDn2Dy4" also associated with it, and the

22

administrator of the page is listed as Jivani.  (Oct. 21, 2010 Tr. 58:4-59:5.)  While Jivani denied

that he was the one who wrote: "The fact New York is an hour away from New Brunswick,

there's no reason to complain, we only charge 50 cents for the Biryanis, which New York doesn't

offer," (Oct. 21, 2010 Tr. 68:17-21), he did admit that the person who wrote it was speaking on

his behalf.  (Oct. 21, 2010 Tr. 69:17-20.)  The Court finds that the password for the account "was

Kati Rolls and Platters, one word," (Oct. 21, 2010 Tr. 73:1-2), and that Jivani allows anyone

working in his restaurant "access to the password to speak on [Jivani's] behalf . . . and

representing to the world as being [Jivani]."  (Oct. 21, 2010 Tr. 73:14-24.)  The Court also notes

that another Facebook page was created called "I ate at Kati Rolls and Platters Indian Grill,"

which states that it was created by "Niraj".  (Oct. 21, 2010 Tr. 75:7-16.)   The page states "Now

Hiring" and lists Jivani's cell phone number.  (Oct. 21, 2010 Tr. 77:16-21.)

       On another website, for Five Star Entertainment, a post appears from "AnDn2Dy4" that

states "Original kati rolls from Greenwich Village invading Rutgers, New Brunswick, New

Jersey, Easton Avenue, cross from Cluck-U Chicken."  (Oct. 21, 2010 Tr. 81:20-82:5.)  Also on

this website, "AnDn2Dy4" threatened violence against other people, having written "I'll have

your fat ass raped"  (Oct. 21, 2010 Tr. 87:7-88:2) and "I'll shove a 9 millimeter Beretta 96 down

your throat."  (Oct. 21, 2010 Tr. 108:3-5.)  The Court notes that also on this website close to

where "AnDn2Dy4" references the 9 millimeter Baretta, Jivani's current cell phone number is

also referred to as that associated with "AnDn2Dy4."  (Oct. 21, 2010 Tr. 108:10-20.)  To this

end, while Jivani denies that he either made these statements or that his agent made these

statements, the Court does not find his denial credible.  (Oct. 21, 2010 Tr. 109:7-23.)

       For the reasons outlined, the Court concludes that there is a substantial likelihood of

success on the merits that Plaintiff can show that Defendant engaged in both infringement of Plaintiff's trade dress and unfair competition.

       2.      <u>Probability of Irreparable Injury in the Absence of Relief</u>

The Third Circuit has held that "[p]otential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." <u>Opticians Ass'n of America</u>, 920 F.2d at 196. Moreover, "[a] finding of irreparable injury can also be based on likely confusion." <u>Id.</u> In <u>Ambassador East, Inc. v. Orsatti, Inc.</u>, 257 F.2d 79 (3d Cir. 1958), the Third Circuit recognized that a plaintiff's trademark "is his authentic seal; by it he vouches for the goods which bears it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies in his own control." <u>Id.</u> at 82 (citations omitted).

The Court has in detail outlined the extent of the conduct alleged in this matter. To this end, the Court concludes that there is a strong probability of continued irreparable injury to Plaintiff in the absence of relief. Not only has the Court concluded that there is a probably of success of the merits of trade dress infringement with evidence of actual customer confusion, but the Court has also detailed what appears to be a very confusing internet presence that Defendant is responsible for creating. Therefore, the Court concludes that there is a strong probability of irreparable injury if Saha and Plaintiff cannot regain control of their trade dress and reputation. In support of this conclusion, the Court incorporates its previous findings of fact.

       3.      <u>Potential harm to the non-moving party</u>

"In deciding whether injunctive relief is appropriate, the third task a trial court must undertake is to balance the hardships to the respective parties. . . . A basic purpose behind the balancing analysis is to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm the trademark's owner." <u>Opticians Ass'n of Am.</u>, 920 F.2d at 197.

The Court has not been presented with any convincing argument or evidence to support the conclusion that Defendant would sustain any overly-burdensome hardship should the Court issue a preliminary injunction.  The harm alleged and for which evidence was submitted with respect to Plaintiff's trade dress and reputation is great.  The Court cannot conclude that requiring Defendant to disclaim any affiliation with Plaintiff, to disavow and remove statements on the internet, to regain control of its internet accounts to the extent that others have Defendant's password, and to change the appearance of its store and marketing in certain ways would cause more harm than that which Plaintiff would sustain if these changes were not ordered.  Specifically, the Court concludes preventing Defendant from using the color orange that it currently uses as the primary color or dominant color or in conjunction or equal part to white or other neutral color on interior or exterior surfaces, signage, fabric, uniforms (including shirts, aprons, hats or other clothing worn by employees as part of their duties), menus, packaging, advertising, promotional materials (whether for sale or distributed for free) or decorative objects in conjunction with Defendant's restaurant does not cause great potential harm to Defendant.  In support of this conclusion, the Court incorporates and has considered its previous findings of fact and conclusions of law.  For these reasons, the Court concludes that the potential harm to Defendant is not outweighed by the extent of harm that would result due to the denial of the

preliminary injunction to Plaintiff.

    4. <u>The Public Interest</u>

   The final factor for this Court to consider is whether the issuance of this preliminary injunction promotes public interest. "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." <u>Opticians Ass'n of Am.</u>, 920 F.2d at 197. If it is "established that there is a likelihood of consumer confusion created by the concurrent use of the marks, it follows that if such use continues, the public interest would be damaged. . . . This result mandates a finding that not only would the public interest be served by the issuance of an injunction, but it would be best served." <u>Id.</u> at 198.

   The Court concludes that the public interest here, the right of the public not to be confused, is properly considered. The potential for and actual confusion that has been presented to the Court at the evidentiary hearing mandates a finding that an issuance of an injunction best serves the public. To this end, the Court incorporates and has considered its finding of facts, in particular with respect to its analysis regarding the <u>Lapp</u> factors.

**III. CONCLUSION**

   For the reasons stated, the Court will grant Plaintiff's motion for a preliminary injunction. An appropriate form of order accompanies this memorandum opinion.

Dated: February 1, 2011

_____ s/ Garrett E. Brown, Jr. _____
GARRETT E. BROWN, JR., U.S.D.J.
